Next case on today's docket is the case in the marriage of Angela Vassen versus John Vassen. We have Jean Albachon, thank you, for the appellant. And we have Mr. Charles Courtney for the accolade. Ms. Albachon, you may proceed. Thank you. Good afternoon, your honors. Will you please report? Counsel? Essentially, in this dissolution of marriage action, we raised four issues on appeal. The first issue is whether a corporation known as VI Inc. was properly classified as marital property. It is our position that that classification was improper and that the husband did prove by clear and convincing evidence that this corporation was actually another entity that was formed before the marriage and consequently after the marriage was merely put into the form of a corporation. It originated as MVI, which was Mississippi Valley Investments, and that was back in 1986. In 1987, VI was formed as a partnership with two partners and a group of investors. The partners were to share 60 percent of profits from the partnership, and then the investors were going to share the remaining 40. And all of the partners and investors, I think this is important, were directors of VI even before it was incorporated. Then, after the marriage had occurred- They were directors of what? Of the partnership. Oh, okay. I didn't know partnerships had directors. Well, this one did. Is that testimony in the record, I guess? Yes, yes. I believe specifically Respondents Exhibit 10 shows the transactions that occurred throughout the life of this business. Then, after the marriage, they formed a corporation. The directors were the same. There was no consideration of changed hands. In fact, the testimony was that this was classified as a 351A exchange under the IRS statute and that the partners, investors, slash directors were essentially the same people. And who were the directors? The directors were John A. Bassin, John J. Bassin, Joseph Bassin, Larry Whitehead, Dr. Julius Klein, and I always forget the last one. I believe the name was Habish, Gary Habish. And I'm sure counsel will probably correct me if I'm incorrect on that. I did not try the case myself, so I'm looking at it from a fresh perspective here. So pardon me if I don't get the names totally right. But they were all the same people that were in VI originally and were changed into shareholders. As I said, there was no additional consideration that changed hands. And John A. Bassin, that would be my client, the husband, his interest can be traced right back to that original business entity as it existed before the marriage. So it is our position that we did show by clear and convincing evidence that this really was a non-marital business, that it existed prior to the marriage, merely changed form. And there were several cases that we cited in support of that where similar things had occurred, where a business existed prior to a marriage, changed into a corporation, and was deemed to be a non-marital asset because it was acquired with an asset that had existed prior to the marriage. Let's say we agreed with you that it was non-marital property. Yes. The case would have to be reversed, remanded. But wouldn't there then still have to be a determination as to whether or not your client's personal efforts during the marriage contributed to the appreciation of that asset, and then whether or not there should be a contribution from that non-marital asset to the marital estate? I absolutely agree. And isn't there evidence in the record that really this didn't have a whole lot of value early on? Sure. It became very valuable during the marriage. But in my reply brief, I cite cases that state that the marital estate is compensated for that personal effort by the money that the person made. You have something new to argue anyway to talk about? I mean, I'm not suggesting that that would determine whether it's marital or non-marital. That's a separate issue. It would be a tracing issue. Yes. That is correct. Okay. Then the second issue is the value of VI itself. Obviously, if you find that it's a non-marital asset, this issue becomes less important. But the court has to look at the value of non-marital and marital assets in making a division of the marital assets. In valuing VI incorporated, the court essentially took one piece of evidence, and that was a financial statement that was submitted to a bank for the purpose of a loan, and used that value as the value of the corporation, whereas the husband put on expert testimony as to what would you be able to sell this business for. And that is what the court is supposed to look at, is if they had to sell it, what can they sell it for? And our expert worked in acquisitions and sales of businesses. He's valued over 75 businesses for those purposes. And he looked at more than just the basic numbers. He looked at what was happening with this business at the time. And at the time that the parties were divorced, which his opinion came out just a few days prior to the dissolution of marriage, he looked at very important factors. And the biggest one is that the business, which was the business of buying tax certificates and then selling them back essentially to the owners who redeemed them for an interest charge. And the interest charge is set at an auction. That tax certificate business bubble burst, and the base values of the certificates went down. The interest rate that could be charged went down dramatically. And these are things that Mr. Brown, the expert, looked at in coming up with this value. Was it one of the things that he looked at, the fact that regents had called in a loan when in fact it turned out that was not the fact? Yes, and that was pointed out to him. And he said it made no difference even though he said it was one of the factors he considered originally. But in addition to that, he personally was a party to the fact that they were trying to apply for loans at other banks and were getting turned down. So I think that whether regents recalled their note or it was paid off I think is a very small detail when you look at the larger picture where they went to several banks and were turned down for loans. And they were not trying to get loans to pay off the early call, or were they? They were. They were also looking to the father, their father, John J. Vasson. But the whole premise is false, that in fact I think it was developed that the bank had documentary evidence that they were the ones that wanted to pay it off early instead of being in a tight, squeezed spot where the bank was trying to call it in. I think it was who moves first. You try and pay off the loan before you get put in a position where you're being forced to pay it off or find another loan at a higher interest rate. What evidence was there that they were going to be forced to pay it off early? I don't believe that there was any evidence other than what was happening with the business at the time. That it was, as I said, the business itself was not as profitable as it had been. There were a number of things that happened to cause that. And I think that they're all cited. In fact, there's evidence that the bank, in fact, renewed the loan in like 2013 and 14? That would be the other bank. The other bank. Yes, there were two. Okay. Yes. So one was, do we pay off this one bank before we think they're going to call it in? Which they did. And the other was just the, is the other bank going to keep extending? And they did, which was a good thing for the business. It didn't go entirely belly up. But I would have to say that the evacuation is not worth what this financial statement that was submitted by the husband to the bank, what he said at that point in time it was worth. I think there's a lot more to it than that. Is it true that at the time that financial statement was submitted that there were already all these problems had come to light? Yes. Yes. I would say that that was probably the start of the end. So could the court, you know, have considered that John A. Vassen, when he signed this financial statement, being truthful about the value of it, that he would have taken into account all those problems and the value of it? Well, but then you're getting into the value of a business for the purpose of extending more credit versus being able to go out and sell it. Which is, that's the purpose that we have to look at, is what would somebody buy this business for? What, when you file an affidavit, you're saying that's not valuing it for what its market value would be? I think that you are, but you're more valuing it as a security interest. So it's only security interest if you can sell it and get that amount of money out of the bank. That's true. Isn't that the purpose of a financial statement to a bank is to say what it's worth, isn't it? Yes, I believe so. But something else to consider is that that financial statement was done almost a year before this divorce. So there were a lot of things transpiring with this business in that year. And the law is that you need to try and value it as close to the date of dissolution of marriage as you possibly can. And I think that is one of the reasons why it's more arbitrary to rely on that financial statement than it is to rely on the expert's opinion, considering all of the market factors that were going on in that business at the time. And I'm sure I'm probably running a little short on time. Do you think that the fact that Brown made some rather large mistakes in his math, I guess, and then said that that didn't affect the final number, that that could have affected the judge's opinion of his credibility? I think that it did. From what he stated in the supplemental judgment of dissolution of marriage, it did affect his opinion. However, we're looking at apples and oranges in that when you take those math or typographical errors, those were dealing with base values of certificates and the expenses of the corporation. But this was not purely an assets versus liabilities look at this business. This was the expert looked at it from a standpoint of what kind of income can it generate for someone who would want to purchase this business. And therefore, I think that the other factors, less dollar and cents factors, really come into play that the expert stressed about the tax certificates decreasing in face value. That happened regardless of what you say about the numbers. The fact that the interest rates dropped incredibly, and that's what you make your money on, is the interest rate. So if the interest rate drops, your ability to make money with this business drops. To kind of save time, I think that my argument regarding the dissipation, I'm just going to stand on my grief on that. And I would like to make mention about the attorney's fees award, that it was arbitrary in the award itself and in the amount. In order to, first of all, there is no case law to support awarding attorney's fees because someone allegedly dissipated assets. Or because I think the other thing was that they tried to sell the business while this divorce was going on. Didn't the judge say and that generated excessive litigation though? In other words, more attorney's fees were incurred because of all that going on. But you have to go back to what is the falsity of the statement that is being alleged. We're talking about one statement. If you look at the Supreme Court rule, whether there was a false statement. And there was just one statement to that effect. And just also the amount, I think, is unreasonably $18,000 for that. Thank you, Ms. Aubuchon. Thank you. We'll have the opportunity to do that. Mr. Courtney. Thank you, Judge. Hey, police court. Ms. Aubuchon. I did try this case, Your Honor. A couple of things. The judge had mentioned it when you talked about the value of this business at various times. The marriage in this case is September of 1988. The partnership was formed in this case in October of 87. So about 10 months, 11 months before the marriage. The corporation then hits. I'm sorry, they were married in August of 88. The corporation is then incorporated in September of 1988. All of these things happened many, many years ago. I disagree with counsel. And I think all you have to do is look at the record, quite frankly. These were not the same owners. This was not an exchange of business form like the cases cited in Mr. Bassett's brief. I think the most important case he cites in the brief is Eddie. In the Eddie case, a gentleman transformed a business over time, similar to this case where business grew greatly in stature. But in Eddie, the husband in that case proved where all that money came from. It wasn't personal effort, as Your Honor brought up. It was non-marital funds that were used to expand that business over time. In this case, I think we start with the presumption that the corporation is marital property. It was created after the marriage of the parties. It's presumed to be marital property. The 351 exchange is a tax issue. It doesn't have anything to do with whether this is marital or non-marital property. And, in fact, all they're required to do to do a 351 exchange is to exchange all of the ownership and partnership for shares of stock. They did that. They didn't keep the same structure of the business. These were investors. They were not partners. The only owners of that partnership prior to this transformation were the two brothers, John and Joe. They were the only owners. There were 50-50 owners. The other folks were investors. Mr. Vassen tried to testify in his deposition that investors and owners are the same thing. His father, who testified on his behalf, did finally admit that they're not the same thing. They don't have the ability to control the business. Well, what happened here is they changed the nature of this business. They added four, I'm sorry, five more individuals, four more individuals actually added that had control of this corporation. They had an ownership interest. They never had that before. This is a completely different entity. The value, Your Honor mentioned, had to increase over time. At one point in 1992, the value of these shares was $18,000. In May of 2013, it was $2.37 million. There was no testimony offered by Mr. Vassen as to where that increase came from. It was his burden to show this was non-marital. I would also point out that when you have marital property and non-marital property that are fulmingled and lose their identity, it's presumed to be marital property. That's what you have here. There was no attempt to rebut this at trial, none whatsoever. The issue on the valuation used by the court, and this isn't the first time I've seen this. I've done a considerable amount of divorce work, as has Ms. Aubuchon. It causes me no end of grief when someone signs a financial statement to a federally insured institution saying that the value of an asset is X. And then they walk into my courtroom to have a case in their divorce case, and they say, oh, wait a minute. It's not really X. It's really a quarter of that because I got that for the bank, and this is what it's really worth. You see that on a regular basis. I think in this case, it's very important. Your Honor, hit it right on the head. The bank renewed this loan not once but twice after this financial statement was filed. The bank relied on the financial statement. Mr. Vassen relied on the financial statement. Mr. Vassen Sr. told Angela the business was worth more than it was on the financial statement. That's in the record as well. So no one had a question about the value of this business until the divorce proceedings started. Now, why did the judge use that value and not a value a year later? Well, what's missing here, what wasn't brought up to you, is the transfer of ownership of this corporation. In July of 2013, Mr. Vassen, without consideration, transferred 100% of his ownership in this business to his brother and his father. There's absolutely no consideration. We went through this ad nauseum in the record and in the evidence deposition trying to find consideration. There was none. There was a statement that Regions Bank called a no. That is simply false. That never happened. Your Honor was correct. Regions Bank had documentary evidence that it was VI, Inc. who asked for the payoff. Mr. Vassen Sr. went as far as to testify to Judge Kelly. We got this done and they only gave us 10 days to clear up this loan. There's no support in this record for that. They simply made it up. And when you have a situation where a party takes the major marital asset and transfers it out to a third party for no consideration, it's the definition of dissipation. I believe Judge Kelly properly relied on the value of that property as of the date it was transferred. I gave the property away in July of 2013, less than 60 days after I told you it was worth $2.37 million. I think the court has justified in relying on that value. Yeah, he's a little unclear what the court was doing with that. I mean, was he saying, you know, as of this date that you filed this financial statement with the bank, it was worth this amount. You gave it up. So you dissipated that much of marital assets and we're going to treat it as if it's still there and you get it? Correct. That's what the trial court, because it's not totally clear from reading the order, but reading between the lines. So he wasn't saying, I'm awarding you the corporation, your interest in the corporation. He was saying, I can't award anybody the corporation because you gave it away. And here's what it was worth, and I'm going to make you put that much back in the pot. Yes, sir. And it gets worse than that because not only did he give it away July 22nd of 2013, his brother and his father reassigned the stock to him. Later in 2013, they both reassigned the stock without restriction. But Mr. Bastin took the position at trial, I don't own the stock. Well, from the trial judge's point of view, I tend to agree with him. You gave it away, but it looks as if you've taken it back, but you tell me it's not yours. So exactly, I'm going to assess the value at 2.4, I'm going to let you keep it for whatever that is. So let me ask another question about that. If that's what the trial judge did, then it really doesn't make any difference about whether it was still worth that amount on the day of trial. Because the question is, what was it worth when he dissipated it? Absolutely. Absolutely, I agree with that. I think that is exactly the point. If I give away my 401k account a year before I get divorced, I don't think I can come in and argue the market fell, you can't hit me for dissipation, look, the market went down. And that's kind of the argument here. It went down in value allegedly because of these events. The allegedly because of these events is a serious problem. Mr. Brown's testimony was flawed. It was flawed on multiple levels. From the point of relying on the banks calling the notes, which never happened, to them not being able to get additional financing in the future, which didn't happen. The bank renewed this loan twice on those financials. The other problem with Mr. Brown's approach is he did not value VIA. He only valued a portion of the business. He valued the stock certificates. He did not value any of the real estate holdings. There was cash in real estate holdings in addition to that interest in tax certificates. None of that was valued. My recollection is that was about an additional $1.4 million. It was never valued at all. The report, once the mathematical errors were pointed out, frankly, I expected they would be corrected from the stand. They were not. I was told they didn't matter. All one has to do is look at his calculations, and you can see that's not true. It simply didn't make any sense. I don't believe the judge gave it much credit, quite frankly. So in sum, it's our position that the property was marital property. If they wanted to rebut that presumption, they could very well have done the things that people did in other cases that were cited to you, such as the Eddy case. They could have come in here and told you where this increase in value came from. They never did that. To say that it's the same entity when the ownership is completely different is not supported by any of the cases that were cited to you. All of those cases that were cited to you were sole proprietors incorporating their business with no change in ownership. It's not what we have here. With regard, lastly, to the attorney's fees, I think you probably sense frustration on the point of the trial court, quite frankly, by the time that award came out. It was one statement. I think Ms. Aufgesund is correct. It was one statement. That statement was very important. That statement was, I have not transferred my interest in this corporation. We went dumb and blind to that transfer until the week of the first trial setting in this case. That's when I found out he had actually transferred this interest. And during that whole period of time, in that intervening months, he was trying to sell the business. They brought in one of the potential buyers to testify to it. So it was one statement in writing that then led to several further consequences, one of which is we continued to extend the TRO in that case. Every time his lawyer came in, his lawyer had to sign off on a pleading that said we'll agree to extend this, not knowing, because Mr. Candy didn't know, not knowing that the stock had already been transferred. So it was one statement in writing that then blossomed into nine months of litigation. It stopped us cold on a trial date in March of 2014. I believe it was March. It was the date the parties were actually divorced because we found out that week the stock had been transferred. So it was a much more egregious statement than simply I hadn't transferred the stock. There were multiple occasions that could have been remedied, and they never were. So I believe, although I would agree that the court was frustrated, I believe the award was appropriate. Thank you. Thank you, Mr. Courtney. Ms. Al-Bashar? I do believe that it is significant to look at the fact that this was a 351C transfer because, by definition, it is a transfer of interest without changing who has the interest. Respondents Exhibit 10 does show that the VI partnership, that the interests were that John and Joe Basson were to receive 60% of the profits and the investors were to receive 40%. That is essentially the same cut as the stock that was divided when the corporation took form. Essentially, Joe and John, 60%, the investors who are now shareholders, 40%. Regarding adding the cash and real estate interests, if you're going to add that in, then you need to take out the $2.4 million in debt that the corporation had at the time. I believe that's pretty much a wash. Also, regarding the fees, the statement that was denied was that John Basson had said that he would transfer all of his stock to his father. Actually, the transfer was to father and brother. I know we attorneys split hairs all the time like that, but he denied that statement because that was not a true statement. Then it's up to discovery, to conduct discovery and find out the ins and the outs. That happens in every case. You deny an allegation and the other side then takes your deposition and asks more questions. Do you think that if his attorney knew that he had in fact made that transfer that he would have answered those interrogatories the same way? As far as admitting and denying the allegations, I personally would probably have made an affirmative allegation after my denial. But it is still a denial nonetheless because that really was not a true statement. Again, splitting hairs, but that's what we do. Do lawyers really do that when they answer discovery? Split hairs. Just a few. As far as the amount of the fees, I think if you look at the record, that's pretty much the entire amount of fees. You're going to say that all of the attorney's fees that were spent were spent because of that one statement. Also in my reply brief, I point out that not only did the court award those fees, but the court took those fees off of the wife's share of the marital property as a debt that she was paying. I don't think that's quite equitable. I think we need to go with either one or the other, but it is our position that those fees were excessive. That's all I have. Any other questions? Thank you both for your arguments and briefs, and we'll take the other end of our time. Thank you. Our pleasure.